KATHLEEN S. H. CHEAPE, JOHN W. DIXON, JR., VIVIAN S. DIXON, JAMES
EDER, MARY EDER, DANA FOWLKES, JOHN B. GRAHAM, SCOTT
HERMAN-GIDDENS, LAWRENCE F. LONDON, EMILY DEWEY LONDON,
SUSAN LORD, EVA McKENNA, ROSALIE MASSENGALE, GEORGE V.
TAYLOR, MARGARET E. TAYLOR, JAMES M. WEBB v. TOWN OF
CHAPEL HILL, A MUNICIPAL CORPORATION, JAMES C. WALLACE, MAYOR,
JULIE ANDRESEN, COUNCILMEMBER, DAVID GODSCHALK, COUNCILMEM-
BER, JONATHAN HOWES, COUNCILMEMBER, DAVID PASQUINI, COUNCIL-
MEMBER, NANCY PRESTON, COUNCILMEMBER, R. D. SMITH, COUNCILMEMBER,
BILL THORPE, COUNCILMEMBER, ARTHUR WERNER, COUNCILMEMBER, AND
FRASER DEVELOPMENT COMPANY OF NORTH CAROLINA

No. 96PA87

(Filed 3 September 1987)

**1. Pleadings § 38.4; Rules of Civil Procedure § 12— judgment on the pleadings—
matters considered**

Although the trial court's order states that it allowed defendants' motion
for summary judgment as well as their motion for judgment on the pleadings,
the judgment was technically on the pleadings only where the trial judge
recited in the order that he considered the pleadings, briefs and arguments of
the parties.

**2. Constitutional Law § 4; Declaratory Judgment Act § 6— standing to contest
validity of local act—no issue after judgment on pleadings**

Where plaintiffs alleged facts sufficient to show their standing to bring a
declaratory judgment action to determine the validity of a local act, their
standing did not remain an issue after the court's entry of judgment on the
pleadings for defendants since (1) for the purpose of defendants' motion for
judgment on the pleadings, defendants are deemed to have admitted the
allegations in question, leaving no factual issues to be resolved, and (2)
although the trial court did not explicitly determine the question of subject
matter jurisdiction, the court is presumed to have found jurisdictional facts in
accordance with plaintiffs' allegations.

**3. Statutes § 2.2— town's participation in economic development—local act—not
unconstitutional act regulating trade**

A local act allowing the Town of Chapel Hill to participate in economic
development projects with private developers is not an act regulating trade in
violation of Art. II, § 24(j) of the N.C. Constitution.

**4. Joint Ventures § 1; Municipal Corporations § 22.2— development agreement
between town and developer—no joint venture for nonpublic purpose**

A development agreement between the Town of Chapel Hill and a devel-
opment company did not create a joint venture since each party to the agree-
ment did not have the right in some measure to direct the conduct of the other
through a necessary fiduciary relationship. Therefore, the development agree-
ment did not establish a joint venture not for a public purpose in violation of
Art. V, § 2 of the N.C. Constitution.

**5. Estates § 1— town's conveyance of air rights—validity**

The Town of Chapel Hill could properly convey air rights in fee simple since (1) ordinary landowners can convey air rights independent of the land beneath; (2) N.C.G.S. § 63-13 does not prohibit a conveyance of air rights independent of the land beneath but merely subjects common law rights recognized and described therein to the right of flight; and (3) the statute permitting municipalities to convey air rights, N.C.G.S. § 160A-273, applies to all municipalities and is thus not a "special act" regulating trade in violation of Art. II, § 24(j) of the N.C. Constitution.

Justices MITCHELL and WHICHARD did not participate in the consideration or decision of this case.

APPEAL by plaintiffs from an award of summary judgment and judgment on the pleadings for defendants entered by *Lee, J.,* after a hearing at the 17 November 1986 Civil Session of Superior Court, ORANGE County. Judgment entered 3 December 1986. Defendants' motion to bypass the Court of Appeals was allowed 7 April 1987. Heard in the Supreme Court 8 June 1987.

*Thomas S. Erwin and Hall, Hill, O'Donnell, Taylor, Manning & Shearon, by Raymond M. Taylor, for plaintiff-appellants.*

*Womble, Carlyle, Sandridge & Rice, by G. Eugene Boyce and Elizabeth L. Riley, and Adams, McCullough & Beard, by Robert W. Spearman, Blair S. Levin, and Douglas Q. Wickhorn, for defendant-appellees.*

*Lacy H. Thornburg, Attorney General, by Douglas A. Johnston, Assistant Attorney General, amicus curiae.*

*Fred P. Baggett, General Counsel, and S. Ellis Hankins, Associate General Counsel, for North Carolina League of Municipalities, and Henry W. Underhill, Jr., City Attorney, and H. Michael Boyd, Deputy City Attorney, for The Office of the City Attorney, Charlotte, North Carolina, amici curiae.*

FRYE, Justice.

Plaintiffs raise four issues before this Court. Initially, they contend that the case should be remanded to the Superior Court, Orange County, for a determination of their standing to bring the instant action. On the merits, they argue that Chapter 961, Session Laws of 1984, is unconstitutional because it is a local act regulating trade and because it permits the Town of Chapel Hill

to engage in a joint venture not for a public purpose, acts prohibited by the North Carolina Constitution. Plaintiffs also specifically attack the sale of air rights by defendant Town to Fraser Development Company of North Carolina as being an invalid transaction. We hold:

1) plaintiffs' contention that their standing remains an issue is without merit;

2) Chapter 961, Session Laws of 1984, does not regulate trade in violation of Article II, section 24(j) of the North Carolina Constitution;

3) the agreement between the Town of Chapel Hill and Fraser Development Company does not create a joint venture;

4) the Town of Chapel Hill has the power to convey air rights as discussed herein.

On 22 June 1984, the General Assembly ratified House Bill 1563, which accordingly became Chapter 961, Session Laws of 1984. This act (hereinafter called "The Chapel Hill Act") provides as follows:

AN ACT TO ALLOW THE TOWN OF CHAPEL HILL TO PARTICIPATE IN ECONOMIC DEVELOPMENT PROJECTS.

The General Assembly of North Carolina enacts:

Section 1. Chapter IV of the Charter of the Town of Chapel Hill, being Chapter 473, Session Laws of 1975, is amended by adding a new Article to read:

"Article 4.
"Economic Development Projects.

"Sec. 4.20. Definition. As used in this Article "economic development project" means an economic capital development project within a certain defined area or areas of the Town as established by the Town Council, comprised of one or more buildings or other improvements and including any public and/or private facilities. Said project may include programs or facilities for improving downtown development, "pocket of poverty" or other federal or State assistance programs which the Town Council determines to be in need of

economic capital development or revitalization and which qualify for capital assistance under applicable federal or State programs.

"Sec. 4.21 Authorization.

(a) In addition to any other authority granted by law, the Town of Chapel Hill may accept grants, expend funds, make grants or loans, acquire property and participate in capital economic development projects, which the Town Council determines will enhance the economic development and revitalization of the Town in accordance with the authority granted by this Article. Such project may include public and/or private buildings or facilities, financed in whole or in part by federal or State grants (including but not limited to urban development action grants), and may include any capital expenditures which the Town Council finds necessary or desirable to complement the project and improve the public tax base and general economy of the Town. By way of illustration, but not limitation, such a project may include the construction or renovation of any one or combination of the following projects:

(1) Privately owned hotel.

(2) Privately owned office building.

(3) Housing.

(4) Parking facilities.

Such project may be partially financed with Town funds received from federal or State sources and being granted or loaned to the private owner for said construction or renovation; in addition, other Town funds from any sources may be used for acquisition, construction, leasing and/or operation of facilities by the town for the general public and for capital improvements to public facilities which will support and enhance the private facilities and the general economy of the Town.

(b) When the Town Council finds that it will promote the economic development or revitalization in the Town, the Town may acquire, construct and operate or participate in the acquisition, construction, ownership and operation of an

economic development project or of specific buildings or facilities within such a project and may comply with any State or federal government grant requirements in connection therewith. The Town may enter into binding contracts with one or more private parties or governmental units with respect to constructing, owning or operating such a project. Such a contract may, among other provisions, specify the responsibilities of the Town and the developer or developers and operators or owners of the project, including the financing of the project. Such a contract may be entered into before the acquisition of any real property necessary to the project by the Town or the developer or other parties.

"Sec. 4.22. Property Acquisition. An economic development project may be constructed on property acquired by the developer or developers, or on property directly acquired by the Town, or on property acquired by the redevelopment commission while exercising the powers, duties and responsibilities pursuant to G.S. 160A-505.

"Sec. 4.23. Property Disposition. In connection with an economic development project, the Town may convey interests in property owned by it, including air rights over public facilities, as follows:

(1) If the property was acquired under the urban redevelopment law, the property interests may be conveyed in accordance with that law.

(2) If the property was acquired by the Town directly, the Town may convey property interests by any procedure set forth in this charter, or the general law or by private negotiation or sale.

"Sec. 4.24. Construction of the Project. A contract between the Town and the developer or developers may provide that the developer or developers shall be responsible for the construction of the entire economic development project. If so, the contract shall include such provisions as the Town Council deems sufficient to assure that any public facilities included in the project meet the needs of the Town and are constructed at a reasonable price. Any funds loaned by the Town pursuant to this paragraph to a private developer or

developers and used by said developer or developers in the construction of a project hereunder on privately owned property shall not be deemed to be an expenditure of public money.

"Sec. 4.25. Operation. The Town may contract for the operation of any public facility or facilities included in an economic development project by a person, partnership, firm or corporation, public or private. In addition, the Town, upon consideration, may contract through lease or otherwise whereby it may operate privately constructed parking facilities to serve the general public. Such a contract shall include provisions sufficient to assure that any such facility or facilities are operated for the benefit of the citizens of the Town."

Sec. 2. This act is effective upon ratification.

1984 N.C. Sess. Laws ch. 961.

Pursuant to this Act, the Town of Chapel Hill (hereinafter "Town") passed a resolution on 30 January 1985 finding, *inter alia*, that a parking shortage existed in downtown Chapel Hill and that the Town had negotiated an agreement with codefendant Fraser Development Company (hereinafter "Fraser") for the development of certain property owned by the Town, located in the heart of downtown Chapel Hill, as an economic capital development project. The resolution declared this area an economic capital development project area. The area in question is located on Rosemary Street at the intersection of Rosemary and Henderson Streets, behind the shops fronting Franklin Street (Chapel Hill's main street).

The "agreement" between the Town and Fraser is actually two agreements, the development agreement itself and a garage lease agreement. Both are long and complex. Essentially, the development agreement provides for the construction of a four-level public/private parking garage with 516 parking spaces, to be surmounted by a "private section" consisting of a condominium inn with 188 units, a restaurant, shops, offices, and a "plaza" area. Fraser was to have title to 188 spaces in the parking garage; the Town was to own the rest. In very basic terms, the Town agreed to deed to Fraser the air rights for the private section and the

188 parking spaces, to give Fraser a ground lease of the site for $100 per year in rent, to pay a pro-rata share of the costs of constructing the garage through issuance of bonds, and to designate Fraser "construction administrator" in return for a fee. Fraser, for its part, agreed to pay the Town $200,000 for landscaping, $400,000 for design costs, $325,000 toward the construction of the Town's part of the garage, and twenty percent of any profits in excess of $1,000,000 received for the sale of the private section units. Fraser also agreed to pay its pro-rata share of the costs of constructing the parking garage and the entire cost of the private section. Fraser would act as "construction advisor" and procure design plans and a general contractor. Various provisions were included to ensure that Fraser met its financial commitments for the project. The second agreement, the garage lease agreement, is a relatively straightforward lease. Basically, the Town agreed to operate the parking garage, to lease from Fraser its 188 spaces in return for a pro-rata share of the operation's "profits," and to reserve 188 spaces in the garage at no charge for owners/guests of the private section, except between 10 a.m. and 2 p.m. on business days, when the number of spaces reserved fell to 72. Fraser agreed to pay its pro-rata share of the costs of operating the garage.

Plaintiffs, who describe themselves in this complaint as residents, citizens and taxpayers of Chapel Hill, brought this action on 27 August 1986 for a declaratory judgment that the Chapel Hill Act was unconstitutional and therefore both it and the agreements were void. Defendants answered, denying most of plaintiffs' allegations. On 27 October 1986, defendants filed a joint motion for judgment on the pleadings, pursuant to N.C.R. Civ. P. 12(c), and for summary judgment. Following a hearing on 17 November 1986, the trial judge, Lee, J., entered an order allowing defendants' motion.

Plaintiffs appealed to the Court of Appeals. Defendants petitioned this Court for leave to bypass the Court of Appeals. This Court granted defendants' petition on 7 April 1987.

I.

[1] Plaintiffs contend that the trial court erred in granting defendants' motion for judgment on the pleadings and summary judgment because a genuine issue of material fact remained to be

resolved. As a preliminary matter, we note that the trial judge recited in his order that he considered the pleadings, briefs, and arguments of the parties. Therefore, as plaintiffs note, although the order states that it allowed defendants' motion for summary judgment as well as their motion for judgment on the pleadings, the judgment was technically on the pleadings only. *See Town of Bladenboro v. McKeithan*, 44 N.C. App. 459, 261 S.E. 2d 260, *appeal dismissed*, 300 N.C. 202, 282 S.E. 2d 228 (1980); *see also Ragsdale v. Kennedy*, 286 N.C. 130, 209 S.E. 2d 494 (1974), and *Wilson v. Development Co.*, 276 N.C. 198, 171 S.E. 2d 873 (1970). To prevail on a motion for judgment on the pleadings, the movant must show that no material issue of fact exists and that the movant is entitled to judgment in his or her favor. *Ragsdale v. Kennedy*, 286 N.C. 130, 137, 209 S.E. 2d 494, 499. A judgment on the pleadings is a final judgment on the merits. *Id.*

[2]   N.C.G.S. § 1-254 (1983) allows "[a]ny person . . . whose rights, status or other legal relations are affected by a statute . . ." to seek a declaratory judgment on the construction or validity of that statute. We have interpreted this section to mean that " '[o]nly those persons may call into question the validity of a statute who have been injuriously affected thereby in their persons, property or constitutional rights.' " *Stanley v. Department of Conservation and Development*, 284 N.C. 15, 28, 199 S.E. 2d 641, 650 (1973). A person who is not thus "injuriously affected" lacks standing to bring the action. *Id. See also Jernigan v. State*, 279 N.C. 556, 184 S.E. 2d 259 (1971); *Greensboro v. Wall*, 247 N.C. 516, 101 S.E. 2d 413 (1958). In their complaint, plaintiffs alleged that the Rosemary Square project, if constructed, would increase pollution, traffic, danger to pedestrians, and crime in their neighborhood and would decrease their property values. Defendants denied both allegations in their answers. Plaintiffs argue that these allegations are necessary to their standing to bring the action. They contend that defendants' denial of their allegations called their standing into question, and thereby the jurisdiction of the trial court to hear the action. *See Greensboro v. Wall*, 247 N.C. 516, 101 S.E. 2d 413. Because the question is both material and unresolved, or so plaintiffs argue, judgment on the pleadings was improper.

Plaintiffs' argument is feckless. For the purpose of a motion for judgment on the pleadings, pursuant to N.C.R. Civ. P. 12(c),

the movant is deemed to have admitted all factual allegations in the non-movant's pleadings except those which are legally impossible and those not admissible in evidence. *Ragsdale v. Kennedy*, 286 N.C. 130, 137, 209 S.E. 2d 494, 499. Thus, for the purpose of defendants' motion, defendants are deemed to have admitted the allegations in question, leaving no factual issues to be resolved.

To the extent that plaintiffs intend by their argument to attack the power of the court to hear the defendants' motion without first explicitly determining the question of its subject matter jurisdiction, their argument also fails. Plaintiffs do not appear from the record before us to have raised this issue before the trial court. The record reflects no request by either party that the trial judge make findings of jurisdictional facts. The judge was therefore not required *ex mero motu* to set out his findings on the preliminary questions necessary for his disposition of defendants' motion. *See* N.C.R. Civ. P. 52. In the absence of such findings, we presume that the judge found facts to support his ruling. *Donovant v. Hudspeth*, 318 N.C. 1, 347 S.E. 2d 797 (1986). Although the question of subject matter jurisdiction may be raised at any time, even in the Supreme Court, *Askew v. Tire Co.*, 264 N.C. 168, 141 S.E. 2d 280 (1965); *Richards v. Nationwide Homes*, 263 N.C. 295, 139 S.E. 2d 645 (1965), where the trial court has acted in a matter, "every presumption not inconsistent with the record will be indulged in favor of jurisdiction . . . ." *Dellinger v. Clark*, 234 N.C. 419, 424, 67 S.E. 2d 448, 452 (1951). The plaintiffs, having alleged facts sufficient to show their standing to bring the instant action, will not be heard to complain where the trial judge is presumed to have found jurisdictional facts in accordance with their allegations. We disapprove of such attempts by any party to "play fast and loose with the judicial machinery." *DiFrischia v. New York Central Railroad Co.*, 279 F. 2d 141, 144 (3rd Cir. 1960). *But see Rubin v. Buckman*, 727 F. 2d 71 (3rd Cir. 1984).

II.

[3]  Plaintiffs next contend that the Chapel Hill Act violates Article II, section 24 of the North Carolina Constitution. That section of the constitution provides:

The General Assembly shall not enact any local, private, or special act or resolution:

. . . .

(j) Regulating labor, trade, mining, or manufacturing . . . .

N.C. Const. art. II, § 24. The Chapel Hill Act expressly authorizes the Town to participate with private developers in "economic development projects." Plaintiffs contend that, as a necessary corollary, the statute also allows private developers to participate with the Town in such projects. They argue that this indirect authorization renders the Chapel Hill Act a local act impermissibly "regulating . . . trade."

We may concede, as the parties do, that the Chapel Hill Act is a local act. *See Smith v. County of Mecklenburg*, 280 N.C. 497, 187 S.E. 2d 67 (1972); *McIntyre v. Clarkson*, 254 N.C. 510, 119 S.E. 2d 888 (1961). However, an act is not constitutionally invalid merely because it is local; it must first violate some constitutional provision. *State v. Smith*, 265 N.C. 173, 179, 143 S.E. 2d 293, 298 (1965). The question for our review, then, is whether by indirectly authorizing private developers to participate with the Town in economic development projects, the Chapel Hill Act "regulates trade" as plaintiffs contend. We conclude that the answer is "no."

Plaintiffs argue that the scope of the constitutional prohibition in Article II, section 24(j) should be the same as the scope of the federal government's power to regulate commerce under the Commerce Clause of the United States Constitution. However, we have previously held that the word "trade" is narrower than the word "commerce." *Johnson v. Insurance Co.*, 300 N.C. 247, 261, 266 S.E. 2d 610, 620 (1980); *Edmisten, Attorney General v. Penny Co.*, 292 N.C. 311, 316, 233 S.E. 2d 895, 899 (1977). Thus, the phrase "regulate trade" necessarily has a narrower meaning than the phrase "regulate commerce." Accordingly, we do not find the federal cases cited by the plaintiffs to be persuasive in this instance.

In interpreting the meaning of Article II, section 24(j), this Court has previously defined the word "trade" to mean "a business venture for profit and includes any employment or business embarked in for gain or profit." *Smith v. County of Mecklenburg*, 280 N.C. at 508, 187 S.E. 2d at 74. *See also Surplus Co. v.*

*Pleasants, Sheriff,* 264 N.C. 650, 655-56, 142 S.E. 2d 697, 702 (1965). The verb "to regulate" has been defined as meaning " 'to govern or direct according to *rule,* . . . to bring under *control* of law or constituted authority.' " *State v. Gulledge,* 208 N.C. 204, 208, 179 S.E. 883, 886 (1935) (emphasis added). Before a local act will fall under the prohibition of Article II, section 24(j), its provisions must fairly be said to "regulate trade" as defined herein. Conceding that the Chapel Hill Act may have some impact upon "trade" as defined herein, we nevertheless do not believe it "regulates" trade, because it sets no rules for nor establishes any control over any activity that could fairly be called "trade."

First, we note that the Act does not impose any rules or restrictions on the activities of any private party. Nor does it impose any on the Town that relate to "trade"; the Act itself imposes only two minor, contingent restrictions upon the Town (in sections 4.24 and 4.25) that are designed solely to protect the public interest in the outcome of two specific types of projects. Nor does the Act confer on the Town any power or authority to regulate the activities of any private party that the Town does not already possess under existing legislation. Nor does it provide for the enforcement of any existing rules. *See* 1984 N.C. Sess. Laws ch. 961.

These factors clearly distinguish the Chapel Hill Act from the legislation found unconstitutional in *Taylor v. Racing Association,* 241 N.C. 80, 84 S.E. 2d 390 (1954), a case relied upon by the plaintiffs. The legislation in *Taylor* was found unconstitutional on three separate grounds, one of which was the violation of Article II, section 24(j). *Id.* As plaintiffs correctly contend, this Court's decision in *Taylor* centered around the scope of the word "trade." *See id.* The Court did not discuss whether the act in that case "regulated" trade. *Id.* A reading of the case discloses that that act established a racing commission with rule-making authority and also fixed the amount of several fees that had to be paid by licensees under the act to the municipality involved. *Id.* We have no doubt that the Court believed that the act establishing the racing commission was so obviously regulatory as not to need any discussion of that question.

Second, the Chapel Hill Act cannot be said to "regulate trade" for the reason primarily advanced by the plaintiffs. All the

Act does is to empower the Town of Chapel Hill to engage in "economic development projects." Absent some restraint, private parties already possess the capacity to engage in such projects, both with and without other parties. A municipality, in contrast, being merely a creature of the General Assembly with the ability to exercise only those powers expressly conferred upon it and those necessarily implied thereby, *Surplus Co. v. Pleasants, Sheriff,* 264 N.C. 650, 142 S.E. 2d 697, may require a specific grant of power before it has the capacity to engage in otherwise permissible activities. By merely declaring that the Town of Chapel Hill has the *capacity* to engage in economic development projects, with or without private parties, the General Assembly was not regulating the projects themselves or the actions of any party in connection with them, including the Town. Therefore, even if one effect of the Act is, as plaintiffs contend, an indirect authorization for private parties to participate with the Town, this indirect authorization, standing alone, cannot be held to "regulate" trade.

Accordingly, we hold that the Chapel Hill Act does not violate Article II, section 24(j) of the North Carolina Constitution because it does not "regulate trade" as required by that Article.

## III.

[4] Plaintiffs next contend that the development agreement[1] between the Town and Fraser created a joint venture not for a public purpose and thereby violates Article V, section 2 of the North Carolina Constitution. After carefully reviewing the record on appeal and the relevant law, we do not believe that this agreement created a joint venture.

All of the aspects of the law of joint ventures are not completely settled, either in North Carolina or in other jurisdictions. *Cf., e.g.,* Comment, *Joint Adventures— The Sharing of Losses Dilemma,* 18 U. Miami L. Rev. 429 (1963); Jaeger, *Partnership or Joint Venture,* 37 Notre Dame L. Rev. 138 (1961); Taubman, *What Constitutes a Joint Venture,* 41 Cornell L.Q. 640 (1956); Nichols, *Joint Ventures,* 36 Va. L. Rev. 425 (1950); Comment, *The Joint*

---

1. Although plaintiffs included the garage lease in their assignment of error, they have elected to argue only the development agreement. Accordingly, any issue with respect to the garage lease, which appears to be a straightforward lease, is deemed waived. N.C. R. App. P. 28.

*Venture: Problem Child of Partnership*, 38 Calif. L. Rev. 860 (1950); Comment, *Joint Venture or Partnership*, 18 Fordham L. Rev. 114 (1949); Mechem, *The Law of Joint Adventures*, 15 Minn. L. Rev. 644 (1931). There is, however, a growing consensus on certain points of the law of joint ventures. In *Pike v. Trust Co.*, 274 N.C. 1, 161 S.E. 2d 453 (1968), this Court quoted with approval from *In re Simpson*, 222 F. Supp. 904, 909 (M.D.N.C. 1963), as follows:

> " 'A joint venture is an association of persons with intent, by way of contract, express or implied, to engage in and carry out a single business adventure for joint profit, for which purpose they combine their efforts, property, money, skill, and knowledge, but without creating a partnership in the legal or technical sense of the term.
>
>         . . .
>
> " 'Facts showing the joining of funds, property, or labor, in a common purpose to attain a result for the benefit of the parties in which each has a right in some measure to direct the conduct of the other through a necessary fiduciary relation, will justify a finding that a joint adventure exists.'
>
> " 'To constitute a joint adventure, the parties must combine their property, money, efforts, skill, or knowledge in some common undertaking. The contributions of the respective parties need not be equal or of the same character, but there must be some contribution by each coadventurer of something promotive of the enterprise.' "

*Pike v. Trust Co.*, 274 N.C. at 8-9, 161 S.E. 2d at 460. This Court went on to say:

> We find these definitions in Black's Law Dictionary, Fourth Edition: Venture: "An undertaking attended with risk, especially one aiming at making money; business speculation." Adventure: "A hazardous and striking enterprise, a bold undertaking in which hazards are to be met and issue hangs upon unforeseen events." Joint Adventure: ". . . A special combination of two or more persons, where, in some specific adventure, a profit is jointly sought, without any actual partnership or corporate designation."

*Id.* at 10, 161 S.E. 2d at 461.

One of the elements of a joint venture on which most, if not all, jurisdictions agree is that each party to a joint venture has a right in some measure to direct the conduct of the other *through a necessary fiduciary relationship*. Stated differently, "each joint venturer [must] stand in the relation of principal, as well as agent, as to each of the other coventurers . . . ." 46 Am. Jur. 2d *Joint Ventures* § 1 (1969 and Cum. Supp. 1986). Plaintiffs contend that this requirement is satisfied in the instant case.

We do not agree. We have carefully reviewed the development agreement, and we find little therein to indicate that the agreement established a principal/agent relationship between the Town and Fraser, and nothing to suggest the existence of this relationship between Fraser and the Town. We have previously defined an agent to be "one who acts for or in the place of another by authority from him." *Julian v. Lawton*, 240 N.C. 436, 440, 82 S.E. 2d 210, 213 (1954). *Cf. Lumber Co. v. Motor Co.*, 192 N.C. 377, 135 S.E. 115 (1926) (distinguishing independent contractor from servant or agent). Under the development agreement, Fraser alone controls the means for constructing the private improvements; the Town has a limited right to approve the final plans. Fraser agreed to procure plans for the public improvements and to select a general contractor to build the parking garage, subject to the Town's approval. In its capacity as construction administrator, Fraser has a limited right to approve minor change orders, but the agreement specifically states that Fraser has no authority to agree to any other changes. Conversely, the agreement gives Fraser no right to exercise any control over those portions of the public improvements that are performed by the Town's Public Works Department, and does not require the Town to undertake any action on Fraser's behalf. Accordingly, while the agreement *might* establish Fraser as an agent of the Town for the limited purpose of authorizing minor change orders, there is nothing in the agreement that establishes the Town as an agent of Fraser. *See Julian v. Lawton*, 240 N.C. 436, 82 S.E. 2d 210; *Lumber Co. v. Motor Co.*, 192 N.C. 377, 135 S.E. 115. Thus, the agreement fails to place the Town and Fraser "in the relation of principal, as well as agent, as to each [other]," 46 Am. Jur. 2d *Joint Ventures* § 1. Having failed to show the existence of an essential element in a joint venture, a right on the part of each party in some measure to direct the conduct of the other through

a necessary fiduciary relationship, plaintiffs' argument that the development agreement creates a joint venture not for a public purpose also fails.

## IV.

[5] Plaintiffs argue lastly that the Town lacks the power to convey air rights in fee simple. We do not find any merit in this argument.

At common law, the holder of a fee simple also owned the earth beneath and the air above—*"cujus est solum, ejus usque ad coelum et ad inferos." Jones v. Loan Association,* 252 N.C. 626, 637, 114 S.E. 2d 638, 646 (1960). This law applies in North Carolina. *See* N.C.G.S. § 4-1 (1986). Plaintiffs concede that air rights are thus a part of land ownership, but they argue that absent specific authority, the holder of a fee simple may not divide his fee horizontally. Nevertheless, they cite no law requiring such specific authority. It appears to be the general rule that absent some specific restraint, the holder of a fee simple may divide his fee in any manner he or she chooses. 23 Am. Jur. 2d *Deeds* § 10 (1983). Accordingly, we find no merit in this argument.

Plaintiffs also argue that N.C.G.S. § 63-12 positively prohibits a conveyance of air rights independent of the land beneath. That statute provides, "The ownership of the space above the lands and waters of this state is declared to be vested in the several owners of the surface beneath, subject to the right of flight described in G.S. 63-13." N.C.G.S. § 63-12 (1985). However, the purpose of the statute was to subject the common law rights recognized and described therein to the right of flight established in N.C.G.S. § 63-13, not to prohibit a conveyance of air rights independent of the land beneath. Accordingly, we also find no merit in this argument.

Municipalities are permitted by N.C.G.S. § 160A-273 (1982) to convey air rights. Plaintiffs contend that this statute is void as being a special act regulating trade in violation of Article II, section 24(j) of the North Carolina Constitution. They argue that the act is a special act because municipalities cannot be meaningfully distinguished in this respect from ordinary landowners, who cannot—according to plaintiffs—convey air rights independent of the

land beneath. *See State v. Dixon*, 215 N.C. 161, 1 S.E. 2d 521 (1939).

N.C.G.S. § 160A-273, however, is not a special act. We have already found no merit in plaintiffs' argument that ordinary landowners cannot convey air rights independent of the land beneath. We have also discussed previously in this opinion the special nature of municipalities; as a creature of the General Assembly, a municipality has only those powers expressly conferred upon it or necessarily implied therefrom. *Surplus Co. v. Pleasants, Sheriff*, 264 N.C. 650, 142 S.E. 2d 697. By enacting N.C.G.S. § 160A-273, the legislature merely conferred upon municipalities a power already held generally by the holder of a fee simple. The statute applies to all municipalities. It is not a special act. *See State v. Dixon*, 215 N.C. 161, 1 S.E. 2d 521.

For the reasons stated herein, the judgment of the trial court is affirmed.

Affirmed.

Justices MITCHELL and WHICHARD did not participate in the consideration or decision of this case.